# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re, <br><br> David Walter Donnell, <br><br><div align="right">Debtor.</div> <br> Jon E. Whitley, <br><br><div align="right">Plaintiff,</div><br> v. <br><br> David Walter Donnell, <br><br><div align="right">Defendant.</div> | C/A No. 16-05131-DD <br><br> Adv. Pro. No. 17-80049-DD <br><br> Chapter 7 <br><br> **ORDER** |

Jon E. Whitley, the plaintiff in this adversary proceeding, seeks a determination from the Court that the debt that he alleges is owed to him by the defendant David Walter Donnell is nondischargeable in Mr. Donnell's chapter 7 bankruptcy case pursuant to 11 U.S.C. § 523(a)(2)(A), for false pretenses, false representations or actual fraud; (a)(4), for embezzlement; and (a)(6), for willful and malicious injury. Mr. Whitley bases his causes of action on his assertion that while he was in business with Mr. Donnell, Mr. Donnell took money and property from their businesses for his personal use. Mr. Donnell denies this allegation. For the reasons set forth below, the Court finds that Mr. Whitley has not met his burden of proof. Therefore, any debt owed to Mr. Whitley by Mr. Donnell is dischargeable in Mr. Donnell's chapter 7 bankruptcy case.

## FINDINGS OF FACT

1.  The Court held a trial of this matter on August 14 and 15, 2018. Mr. Whitley presented testimony of six witnesses and also testified. Mr. Donnell testified but presented no other witnesses.

2.Mr. Whitley and Mr. Donnell met in approximately 2004 and decided to go into business together some years later. Mr. Whitley and Mr. Donnell owned two corporations, JCD, Inc. ("JCD") and JD Squared, Inc. ("JD Squared"). Both corporations operated cigar and wine stores. JCD operated stores in downtown Charleston and North Charleston. JD Squared operated a store in Hilton Head Island.

3.The parties presented conflicting testimony regarding Mr. Whitley's and Mr. Donnell's percentages of ownership in JCD and JD Squared. Initially each, along with Chris Peters, owned one-third of the issued shares. After Chris left the business, Mr. Donnell had either a 49% or 50% interest, and Mr. Whitley had either a 50% or 51% interest. The parties conceded in their pre-trial stipulation that the determination of their ownership percentages was immaterial for purposes of this adversary proceeding. Despite this, during the trial the parties focused much attention on the issue.

4.Mr. Whitley also owns Coastal Firearms, a gun shop, and Whitley and Associates, with cigar and wine stores in Mount Pleasant and Columbia.

5.During at least part of the time that he had an ownership interest in JCD and JD Squared, Mr. Donnell served as the general manager of the cigar and wine stores in North Charleston, downtown Charleston, and Hilton Head. Mr. Whitley testified that he made Mr. Donnell the general manager of all the cigar and wine stores, other than the Columbia store; however, Mr. Donnell disputed that he ever managed the Mount Pleasant store.

6.During at least part of the time Mr. Donnell served as general manager he was also in charge of the businesses' financial records. During this period he used Quickbooks software on his personal laptop to record income and expenses. Mr. Donnell testified that he was in charge of keeping the businesses' books about 50% of the time. He testified that the businesses employed

2

several other bookkeepers between 2009 and 2014 and that he was only responsible for maintaining the financial records when they were "in between" bookkeepers.

7. Katrina Floyd, a bookkeeper, began working for Mr. Whitley in 2013 and keeping the books for his gun store. She began keeping the books for JCD and JD Squared in December 2013. She testified that Mr. Whitley asked her to do this because he believed that Mr. Donnell was stealing money from the businesses.

8. Ms. Floyd testified that she recreated the books for JCD and JD Squared from bank statements going back to 2012. Ms. Floyd testified that Mr. Donnell's personal credit card bills were paid from the business accounts, identifying the payments from Mr. Donnell's name next to the entries. She testified to $53,000 in payments from the Charleston store account and $6,000 from the North Charleston store account in payment of Mr. Donnell's personal credit card statements. She also testified that there were suspicious charges on a business debit card, including a recurring charge for a lawn care business, restaurants, and a hotel in Chicago, Illinois– approximately $3,000 on the downtown Charleston store account, $1,200 on the Hilton Head store account, and $2,900 on the North Charleston store account. She testified that Mr. Whitley claimed to know nothing concerning these charges.

9. Mr. Donnell stated that he often used his American Express and Chase cards for business expenses, including purchases from vendors for the stores and expenses for attendance at and purchases made at trade shows, and that he then reimbursed himself for those expenses from the business bank accounts. Mr. Donnell testified that Mr. Whitley was aware of this. A transaction statement for the American Express card, introduced in an effort to impeach Mr. Donnell, was consistent with his statement that business expenses were charged to his personal account.

3

10. Mr. Donnell testified that the recurring lawn care debit charges were inadvertently charged to the business account rather than his personal account at the same bank and had been repaid. With respect to charges made in Chicago, Illinois, he testified that his personal card had been frozen due to a fraud alert and therefore he used the business card during his trip. He testified that the funds had been repaid. None of the business checking account statements were introduced to rebut this testimony, although the accounts are in the control of Mr. Whitley.

11. There was testimony concerning a corporate charge card at Sam's Club that was used for business purchases and by all three original owners in JCD and JD Squared for personal purchases as part of an undocumented salary package. There was a dispute regarding whether authority to make the personal purchases was terminated. No other evidence supported or contradicted these conflicting statements.

12. Other than the conflicting testimony concerning the charges described in paragraphs 8, 9, 10, and 11 above, no documents were admitted into evidence regarding the actual transactions. A series of summaries regarding some of these transactions was offered in evidence but not admitted because the underlying detail was not available at trial and had apparently not been exchanged during discovery.

13. Testimony was conflicting regarding whether Mr. Whitley had access to the businesses' financial information during the time that Mr. Donnell handled the businesses' books. Mr. Whitley testified that he had no access to the books, although he conceded that he was a signatory on all of the businesses' bank accounts. Ms. Floyd and Patrick Segnious, the current general manager for the stores owned by Whitley and Associates, testified that Mr. Whitley was "very hands off" with the businesses' finances.

14. Mr. Donnell testified that although he recorded the financial transactions using Quickbooks software on his laptop, all physical records were kept at Mr. Whitley's gun store, bank statements were mailed directly to the gun shop, and that the CPA, Brad Love, also had a copy. Mr. Donnell testified that he visited the gun store about once a week to update the books. Mr. Donnell testified that his laptop crashed prior to his resignation but that Mr. Love also had copies of all records.

15. In early 2014, Mr. Donnell ceased serving as the general manager of the stores. Mr. Whitley testified that he relieved Mr. Donnell of his duties because he suspected that Mr. Donnell was taking money from the businesses. Mr. Donnell testified that he resigned in August 2014 because he was uncomfortable with Mr. Whitley's business practices, which he claimed included failing to report cash sales on tax returns and unprofessional dealings with vendors and third parties.

16. Mr. Whitley introduced into evidence an email exchange with Mr. Donnell, in which he asked Mr. Donnell for yearly gross sales figures for the downtown Charleston, North Charleston, and Hilton Head stores. His request stated, "I know the gross amount claimed on our taxes will be different but I need the actual gross sales and the adjusted gross sales for taxes." Mr. Donnell responded sending Mr. Whitley the requested information for 2009-2014.[1]

17. Mr. Whitley introduced into evidence an email from Ms. Floyd[2] showing the difference between the gross sales figures provided by Mr. Donnell as referenced in paragraph 16

---

[1] There are no 2009 figures for the Hilton Head store because it opened in 2010.
[2] This email was dated February 3, 2017, after the filing of Mr. Donnell's bankruptcy case.

5

and the sales figures reported in files she received from Mr. Love.[3] The differences were as follows:

> North Charleston
>
> 2009-$44,876.87
> 2010-$52,565.47
> 2011-$18,509.53
> 2012-$2,283.79
>
> Hilton Head
>
> 2010-$7,113.59
> 2011-Mr. Donnell's sales figure was higher than the figure Ms. Floyd received from Mr. Love
> 2012-$14,867.38
>
> Downtown Charleston
>
> 2009-$18,061.39
> 2010-$49,754.16
> 2011-$88,816.63
> 2012-$8,107.21
> 2013-Mr. Donnell's sales figure was higher than the figure Ms. Floyd received from Mr. Love

For the most part, the income from Mr. Love's files is more than the gross sales figures from Mr. Donnell's Quickbooks files. There is no explanation why the information received from Mr. Love reports more income in the period before 2012 when Ms. Floyd recreated the books from bank records nor how this supports the allegation that Mr. Donnell was stealing money. For 2012, Mr. Love's numbers reflect a total of $25,258.38 more in gross sales than Mr. Donnell's figures.

18. For 2013, as to the North Charleston and Hilton Head stores, Ms. Floyd's email states, "Brad doesn't apparently have the sales total for that year either. As I've said, I was only able to pull up info off of Wells Fargo when I began to "build" the books on QB's Online to

---

[3] The tax returns were not offered into evidence. Ms. Floyd testified she used "the files that Brad sent over" in computing the difference. These files are not in evidence and the Court is left to guess the nature of the sales information in the files.

6

November 2013 for this particular account." For 2013, as to the downtown Charleston store, Ms. Floyd's email reflects that Mr. Donnell's numbers were nearly $100,000 more than the numbers provided by Mr. Love. Her email states, "The only thing that might explain the discrepency [sic] is the fact that he must've included the $25,000 uncategorized deposit that was made on 6/4/13 . . . another uncategorized deposit of $41,250.00 that was made on 9/11/13 . . . and the $20,479.99 deposit that he made on 12/30/13 to "repay" the company. As for the other two large sum deposits, that might've been from the money that Don lent the company. It doesn't specify." No further explanation or evidence was provided regarding the deposits referenced.

19. Ms. Floyd testified that she took over the books in 2014, so her email did not contain any calculation of differences in sales figures for 2014.

20. Mr. Donnell testified that Mr. Whitley's general practice was not to report cash sales on the businesses' taxes. Mr. Donnell testified this was the reason for the difference in his numbers and the numbers Mr. Love and Ms. Floyd provided to Mr. Whitley. Mr. Donnell testified that the numbers he provided to Ms. Floyd were the sales figures reported on the businesses' tax returns, not the actual sales. None of the tax returns, accountant files or Quickbook files were introduced into evidence; thus, the Court is left to speculate whether the figures provided are comparable in nature and why the sums differ.

21. Mr. Love, the CPA who has prepared the tax returns for Mr. Whitley's businesses, including JCD and JD Squared, beginning in 2008, testified that once Mr. Donnell was no longer keeping the books, gross sales drastically increased and profitability somewhat improved. Mr. Love testified that the first year after Mr. Donnell ceased handling the finances, gross sales increased over $200,000.00 and remained consistent in subsequent years.

7

22. Ms. Floyd testified that the businesses were healthy when she took over bookkeeping in 2014. However, Ms. Floyd, Mr. Whitley, and Mr. Segnious testified that Mr. Whitley had to put $300,000.00 in personal funds into the businesses to keep them afloat after Mr. Donnell's resignation.

23. Mr. Segnious indicated that the downtown Charleston location had consistent issues with maintaining inventory when he first started working for the businesses. Mr. Segnious indicated that once Ms. Floyd took over managing the books, he was able to better maintain inventory because there was enough money in the bank accounts to make large purchase orders of inventory.

24. Mr. Donnell testified that the stores had some issues with inventory because the Hilton Head store and the downtown store were opened within a short time of each other, and that put a financial burden on the stores. Difficulties with the profitability of a separate Whitley and Donnell venture, a liquor store, also contributed to cash and inventory problems across all of the businesses according to Mr. Donnell. Additionally, Mr. Donnell testified that other issues with inventory were due to Mr. Whitley's disagreements with various sales representatives and vendors.

25. Mr. Whitley testified there were inventory issues while Mr. Donnell was general manager. Mr. Whitley also testified that Mr. Donnell gave away and used inventory without paying for it. However, two current employees as well as Mr. Donnell testified that Mr. Whitley often took wine or cigars from the stores without paying for them. Both Mr. Whitley and Mr. Donnell testified that they had an agreement they would maintain a running list of those items each consumed or took from the stores and would, at some point, "settle up." Mr. Donnell testified that he maintained this list, but Mr. Whitley's consumption of products from the store were often not added to the list. This list was not introduced into evidence.

26. After Mr. Donnell's resignation, he filed an action against Mr. Whitley in state court on October 31, 2014, asserting causes of action for breach of fiduciary duty, breach of contract, conversion, accounting, minority membership oppression, dissolution, and injunctive relief. Mr. Whitley answered and counterclaimed, asserting causes of action for breach of fiduciary duty, conversion, accounting, unfair trade practices, fraud/fraudulent misrepresentation/negligent misrepresentation, constructive fraud, injunctive relief, and declaratory relief.

27. Mr. Donnell filed a chapter 13 bankruptcy case on October 10, 2016, staying the state court action. On February 16, 2017, Mr. Donnell filed a notice of voluntary conversion, converting his chapter 13 case to one under chapter 7.

28. On May 22, 2017, Mr. Whitley commenced this adversary proceeding, asserting that the debt owed to him by Mr. Donnell, if any, is nondischargeable in Mr. Donnell's bankruptcy case pursuant to 11 U.S.C. § 523(a)(2)(A), (4), and (6).

29. Mr. Donnell filed an answer on June 22, 2017 and asserted counterclaims for violations of the automatic stay based on Mr. Whitley's continuing pursuit of criminal proceedings against Mr. Donnell. Mr. Whitley answered the counterclaims on July 13, 2017. The Court dismissed the counterclaims on October 24, 2017.

## **CONCLUSIONS OF LAW**

Mr. Whitley seeks a determination from the Court that the debt Mr. Donnell owes him, if any, is nondischargeable in Mr. Donnell's bankruptcy case. "Generally, 'all legal obligations of the debtor, no matter how remote or contingent,' are potentially dischargeable in bankruptcy." *Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493, 497 (4th Cir. 2008). Several exceptions to this general rule are set forth in 11 U.S.C. § 523. Exceptions to discharge under section 523 are to be construed narrowly in order to protect the bankruptcy code's stated purpose

9

of providing debtors with a fresh start. *Kubota Tractor*, 524 F.3d at 497 (quoting *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999)). However, courts should be "equally concerned with ensuring that perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *Taylor v. Davis (In re Davis)*, 494 B.R. 842, 867 (Bankr. D.S.C. 2013) (quoting *Biondo*, 180 F.3d at 130). The party challenging the dischargeability of its debt bears the burden of proving the debt non-dischargeable by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). *See also Estate of McCoy v. McCoy (In re McCoy)*, C/A No. 15-70395-SCS, Adv. Pro. No. 15-07042-SCS, 2016 WL 4268702, at *8 (Bankr. E.D. Va. Aug. 11, 2016) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994); *Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir. 1988); *Dominion Va. Power v. Robinson (In re Robinson)*, 340 B.R. 316, 328–29 (Bankr. E.D. Va. 2006); *Elrod v. Bowden (In re Bowden)*, 326 B.R. 62, 82 (Bankr. E.D. Va. 2005); *Whitson v. Middleton (In re Middleton)*, 100 B.R. 814, 818 (Bankr. E.D. Va. 1988)) ("Under § 523(a), the plaintiff carries the burden of proof and must prove by a preponderance of the evidence that the debt at issue is nondischargeable.").

Therefore, in order to prevail on his causes of action, Mr. Whitley must establish by a preponderance of the evidence that "the protections offered by §§ 523(a)(2)(A), [523(a)(4),] or 523(a)(6) apply to the facts alleged and prevent the debt in question from being discharged." *McCoy*, 2016 WL 4268702, at *8. The preponderance of the evidence standard "'simply requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence."'" *Concrete Pipe and Prods. of California, Inc. v. Constr. Laborers Pension Trust for S. California*, 508 U.S. 602, 622 (1993) (quoting *In re Winship*, 397 U.S. 358, 371-72 (1970)).

10

"Unlike other standards of proof such as reasonable doubt or clear and convincing evidence, the preponderance standard 'allows both parties to share the risk of error in roughly equal fashion,' . . . except that 'when the evidence is evenly balanced, the [party with the burden of persuasion] must lose.'" *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (citations omitted) (alteration original). Thus, in a situation where parties' statements contradict, such as this one, and there is no other evidence presented, the burden of establishing credibility does not shift, and the party with the burden of proof will not prevail.

### A. Section 523(a)(2)(A)

Section 523(a)(2)(A) provides that debts incurred "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud" are non-dischargeable. To prevail under section 523(a)(2)(A), a creditor must establish the following elements:

  (1) that the debtor made a representation;
  (2) that at the time the representation was made, the debtor knew it was false;
  (3) that the debtor made the false representation with the intention of defrauding the creditor;
  (4) that the creditor justifiably relied upon the representation; and
  (5) that the creditor was damaged as the proximate result of the false representation.

*Davis*, 494 B.R. at 867 (quoting *Lind Waldock & Co. v. Morehead*, 1 F. App'x 104, 107 (4th Cir. 2001)). *See also CoastalStates Bank v. Paxton (In re Paxton)*, C/A No. 12-02509-dd, Adv. No. 12-80219-dd, 2013 WL 5878462, at *7 (Bankr. D.S.C. Oct. 31, 2013) (quoting *Biondo*, 180 F.3d at 134) (setting forth elements of a section 523(a)(2)(A) cause of action as: "(1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation.").

Mr. Whitley has not established the elements required for a finding of nondischargeability under section 523(a)(2). Mr. Whitley asserted that Mr. Donnell misrepresented to him that "he

11

was properly, accurately, and faithfully maintaining proper business records and properly managing the business ventures,"[4] while Mr. Donnell was actually misappropriating cash, inventory, and credit from the business. Mr. Whitley presented testimony from Ms. Floyd that the sales figures Mr. Donnell provided were substantially lower than the sales figures calculated by Ms. Floyd using the businesses' bank accounts, as well as emails from Mr. Donnell and Ms. Floyd showing differences in sales figures.[5] However, the files Mr. Love apparently provided to Ms. Floyd, on which she based her email, were not introduced into evidence, leaving the Court to guess as to what exactly those numbers reflected. No other evidence was presented to support Mr. Whitley's assertion that the difference in numbers was due to Mr. Donnell taking money from the businesses. Mr. Donnell testified to the contrary regarding the differences in sales figures, stating that the difference was due to Mr. Whitley's business practice of not reporting cash sales on the businesses' tax returns. Further, Mr. Donnell's numbers for the downtown Charleston store were nearly $100,000 greater than the figures apparently provided by Mr. Love, and Ms. Floyd's email indicates that the possible explanation for this is due to various deposits made in 2013–but again, no additional evidence or explanation was provided regarding those deposits.

Mr. Donnell also testified that the parties kept a ledger of the inventory taken from the business by both Mr. Donnell and Mr. Whitley and had an arrangement that they would "settle up" these purchases. Mr. Donnell also provided explanation for both the debit card purchases made from the business bank accounts and the credit card payments made from the business bank accounts on Mr. Donnell's personal credit cards. Mr. Whitley did not provide sufficient evidence to establish that Mr. Donnell made misrepresentations regarding his properly maintaining the

---

[4] *See* Mr. Whitley's Complaint, Docket No. 1.
[5] Mr. Whitley also attempted to introduce into evidence summaries created by Ms. Floyd showing expenses paid from the businesses' bank accounts. However, as set forth above, Mr. Donnell's counsel objected to the admission of these exhibits and the Court sustained her objection based on the unavailability of the underlying documents.

12

business records and managing the businesses. Accordingly, Mr. Whitley has not met his burden of proof as to section 523(a)(2)(A).

### B. Section 523(a)(4)

Section 523(a)(4) provides that a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" is excepted from discharge. "'Embezzlement is generally defined under federal law as "the fraudulent appropriation of property by a person to whom such property has been intrusted [sic] or into whose hands it has lawfully come."' . . . "A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Davis*, 494 B.R. at 875–76 (internal citations omitted). *See also O'Connor v. Booker (In re Booker)*, 165 B.R. 164, 171 (Bankr. M.D.N.C. 1994) (quoting *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991)) ("Under federal law, embezzlement requires three elements: '"(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud."'"); *Orumwense-Lawrence v. Osula (In re Osula)*, 519 B.R. 361, 379 (Bankr. D. Mass. 2014) ("'[U]sing entrusted money for the recipient's own purposes in a way he knows the entrustor did not intend or authorize' constitutes embezzlement. 'It is knowledge that the use is devoid of authorization, . . . that makes the conversion fraudulent and thus embezzlement.'") (internal citations omitted).

Mr. Whitley has also not met his burden as to section 523(a)(4). While the parties do not dispute that Mr. Donnell served as the general manager for at least some of the stores and that he was control of the businesses' finances for at least part of the time the parties were in business together, Mr. Whitley did not establish that Mr. Donnell appropriated money or inventory for

13

purposes other than those for which the property was entrusted to him. As set forth above, Mr. Donnell provided other reasons for the difference in sales figures set forth in Ms. Floyd's email and the charges showing on the business bank accounts. Mr. Donnell testified that any inventory he took from the stores was either paid for or listed on the ledger the parties maintained based on their agreement to ultimately "settle up." Additionally, Mr. Whitley did not show any circumstances indicating fraud. Simply stating that Mr. Donnell stole money, no matter how many times it is repeated, is not a substitute for evidence of misappropriation. Mr. Whitley did not satisfy his burden of establishing the debt is nondischargeable under section 523(a)(4).

### C. Section 523(a)(6)

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." For purposes of section 523(a)(6), "'[w]illful' requires deliberate or intentional acts, while 'malicious' refers to acts that are 'wrongful and without just cause or excessive even in the absence of personal hatred, spite, or ill will.'" *Brannon v. Reynolds (In re Reynolds)*, 543 B.R. 236, 244 (Bankr. S.D. W.Va. 2015) (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *Nestorio v. Assocs. Commer. Corp. (In re Nestorio)*, 250 B.R. 50, 57 (D. Md. 2000)). *See also Davis*, 494 B.R. at 876 (quoting *Thompson v. Myers (In re Myers)*, 235 B.R. 838, 842 (Bankr. D.S.C. 1998)) ("'An act is "malicious" within the meaning of § 523(a)(6) if wrongful and without just cause or excuse.'"). Furthermore, "it is the debtor's subjective state of mind that is relevant," and malice can be found implicitly through the "acts and conduct of the debtor in the context of [the] surrounding circumstances." *First Nat'l Bank of Maryland v. Stanley (In re Stanley)*, 66 F.3d 664, 668 (4th Cir. 1995) (citations omitted) (alteration original).

Mr. Whitley did not establish that the debt, if any, is nondischargeable pursuant to section 523(a)(6). Again, Mr. Donnell provided conflicting testimony regarding each wrongful act Mr. Whitley alleged he committed. There is no other evidentiary support indicating that Mr. Donnell acted willfully or maliciously to injure Mr. Whitley, his businesses, or his property. Mr. Whitley has not met his burden under section 523(a)(6).

## CONCLUSION

For the reasons set forth above, Mr. Whitley has failed to satisfy his burden of establishing by a preponderance of the evidence that the debt Mr. Donnell owes him, if any, is nondischargeable. Accordingly, any such debt is discharged in Mr. Donnell's bankruptcy case.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**09/10/2018**



_____
David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina

Entered: 09/11/2018

15